# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIENT SOLUTIONS ARCHITECTS, LLC; and THE HARTFORD,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.: 19cv123-MMA (MSB)<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 25] |

Plaintiffs Client Solutions Architects, LLC ("CSA") and The Hartford (collectively, "Plaintiffs") bring this subrogation action asserting a claim for negligence against Defendant the United States of America ("Defendant") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. *See* Doc. No. 1 (hereinafter "Compl."). Defendant moves for summary judgment, arguing that Plaintiffs' claim is time barred. *See* Doc. No. 25. Plaintiffs filed an opposition, to which Defendant replied. *See* Doc. Nos. 29, 32. The Court found the matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1. *See* Doc. No. 33. For the reasons set forth below, the Court **DENIES** Defendant's motion.

/ / /

/ / /

# BACKGROUND[1]

Plaintiffs bring this action in the place of Michelle Gibson, a former CSA employee who contracted a mold infection allegedly due to exposure at the U.S. Navy's Space and Naval Warfare Systems Command ("SPAWAR"). SPAWAR is located at 4301 Pacific Highway, San Diego, CA 92110. During the relevant time period, Ms. Gibson worked as a Senior Consultant who provided support to executive officers in SPAWAR's Office of the Chief Engineer (also known as the 5.0 office). The 5.0 office is located in a building referred to as Old Town Building 3 within the SPAWAR campus.

Ms. Gibson began to develop upper respiratory infections in October 2015, which she attributed to the environmental conditions at the SPAWAR facility where she worked. *See* Doc. No. 25-4 (hereinafter "Lodgment"), Ex. 4 (explaining that her several upper respiratory infections were "[c]aused by exposure to mold."). From October 2015 to April 2016, Ms. Gibson experienced watery eyes, blurry vision, dry eyes, chest congestions, sinus pressure, headaches, night sweats, insomnia, dizziness, and vertigo while working in Old Town Building 3. Ms. Gibson documented her concerns of environmental exposure at work in a spreadsheet wherein she stated that she suffered from multiple upper respiratory infections from November 30, 2015 through February 2, 2016. In November 2015, however, an industrial hygienist inspected the office where Ms. Gibson worked and reported that "no evidence of water intrusion or mold growth was found." *Id.*, Ex. 5.

Ms. Gibson further documented specific respiratory and other conditions she felt in response to office conditions from February 1, 2016 through February 3, 2016. These conditions included sinus pressure, headache, and heavy chest. In an email to a colleague dated February 16, 2016, Gibson wrote, "Heavy chest is still there. . . . snotty nose and

---

[1] These material facts are taken from the parties' separate statements of undisputed facts and pertinent cited exhibits. Disputed material facts are discussed in further detail where relevant to the Court's analysis. Facts that are immaterial for purposes of resolving the current motion are not included in this recitation.

cough . . . . Seems when I had my blood work done I should have had them test for fiberglass, mold, and aldehyde again. . . . ." *Id.*, Ex. 8.

In March 2016, an industrial hygienist retained by SPAWAR conducted an indoor air quality survey and tested for indoor concentrations of mold spores in the office where Ms. Gibson worked. *See id.*, Ex. 9. Testing revealed high concentrations of mold spores in Room 1900, which was down the hall from Ms. Gibson's office. *See id.* However, testing did not reveal any high or unusual concentrations of mold spores near Ms. Gibson's work station or in any of the several rooms between Room 1900 and Ms. Gibson's work station. *See id.*

On April 19, 2016, a pulmonary specialist, Dr. Julian Lichter, informed Ms. Gibson that her testing revealed she had been exposed to mold, which was of interest because Ms. Gibson previously reported that she had been exposed to mold while at work. In September 2016, a bronchoscopy indicated that Ms. Gibson had been infected with three types of aspergillus mold and Ms. Gibson also tested positive for exposure to Nocardia.

Ms. Gibson pursued a workers' compensation claim with her employer, CSA, in December 2016. On April 9, 2017, Ms. Gibson completed a form detailing her alleged injuries and exposure to environmental conditions at work in support of her workers' compensation claim. Ms. Gibson identified her date of injury as October 15, 2015.

On August 24, 2017, Dr. Lonky issued a comprehensive medical evaluation report to the Hartford assessing Ms. Gibson's injuries in connection with her workers' compensation claim. Dr. Lonky recommended that Ms. Gibson be provided temporary total work disability for all time that she missed due to treatment of her aspergillus infection. On March 9, 2018, Plaintiffs submitted administrative tort claims to the U.S. Navy pursuant to the FTCA asserting that as a result of Ms. Gibson's infections, Plaintiffs were obligated to pay workers' compensation benefits to Ms. Gibson.

Plaintiffs commenced the instant action in this Court on January 17, 2019. *See* Compl. Plaintiffs seek monetary damages to fully and reasonably compensate for all

injuries caused by Defendant's alleged actions, attorney's fees, costs of the lawsuit, and prejudgment interest to which Plaintiffs may be entitled. *See id.* Defendant moves for summary judgment, arguing that Plaintiffs' claim is barred by the applicable statute of limitations. *See* Doc. No. 25-2.

## **LEGAL STANDARD**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248.

The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party does not bear the burden of proof at trial, he may discharge his burden of showing no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *Id.* at 324. The party opposing summary judgment cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir.), *cert. denied*, 555 U.S. 827 (2008) (internal quotation marks omitted).

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences

in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## DISCUSSION

**1. Plaintiffs' Evidentiary Objections**

As a preliminary matter, Plaintiffs assert that Defendant improperly relies on inadmissible evidence in support of its motion. Specifically, Plaintiffs object to Defendant's Exhibits 1-15 on the grounds that: (a) Defendant has failed to authenticate the documents under Federal Rule of Evidence 901; and (b) the documents constitute hearsay, for which Defendant has not provided an exception. *See* Doc. No. 29 at 6. Exhibits 1-15 generally consist of emails, letters, and spreadsheets from Ms. Gibson, Ms. Gibson's medical records, reports regarding SPAWAR's indoor air quality, a workman's compensation form completed by Ms. Gibson, Standard Form 95 administrative tort claims submitted by Plaintiffs on behalf of Ms. Gibson, and a draft performance evaluation filled out by Ms. Gibson. *See* Lodgment. The Court addresses Plaintiffs' objections in turn.

    a. Authentication

With respect to authentication, Plaintiffs claim that Defendant fails to authenticate Exhibits 1-15 and "should have laid a proper foundation, such as by deposing Gibson . . ., but defendant did not." Doc. No. 29 at 7. In response, Defendant asserts that the relevant exhibits are authentic because they were either produced by Plaintiffs during discovery or were produced by the United States pursuant to a self-authentication agreement with Plaintiffs. *See* Doc. No. 32 at 2. Additionally, defense counsel submits a declaration to authenticate Exhibits 1-15 as true and correct copies of documents produced in discovery. *See* Doc. No. 25-3 (hereinafter "Lai Decl.").

Federal Rule of Evidence 901 provides in part that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Documents authenticated through personal knowledge must be "attached to

an affidavit that meets the requirements of [Federal Rule of Civil Procedure 56(c)] and the affiant must be a person through whom the exhibits could be admitted into evidence." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002) (quotation omitted).

Here, Defendant first contends that Exhibits 1, 2, 3, 7, and 13 are self-authenticating because Plaintiffs produced these exhibits during discovery. *See* Doc. No. 32 at 2. Plaintiffs do not challenge the content or accuracy of these exhibits. Therefore, the Court finds the declaration of counsel sufficient to authenticate Exhibits 1, 2, 3, 7, and 13 for the present purpose. *See Orr*, 285 F.3d at 777 n.20 (finding that documents produced by a party in discovery were deemed authentic when offered by the party-opponent) (citing *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996)).[2]

Second, Defendant maintains that Exhibits 4-6, 8-12, 14, and 15 are self-authenticating under an agreement entered into between the parties. *See* Doc. No. 32 at 3. "Authentication can also be accomplished through judicial admissions such as stipulations, pleadings, and production of items in response to subpoena or other discovery request." 31 Fed. Prac. & Proc. Evid. (Wright and Miller) § 7105 (1st ed.).

In the parties' joint discovery plan, the parties informed the Court that they "agree that all information produced pursuant to the production specifications described in Appendix A are authentic for the purposes of Fed. R. Evid. 901, except for information collected from social media." Doc. No. 16 at 9. "[I]f an objection is made to information provided pursuant to the production specifications that was not collected from social media, the *objecting party* bears the burden to prove that the information is not

---

[2] Moreover, Plaintiffs' Exhibit C is identical to Defendant's Exhibit 7. *See* Doc. No.29-2, Ex. C. As such, Plaintiffs concede the authentication of Defendant's Exhibit 7. *See Orr*, 285 F.3d at 776 ("[W]hen a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties."); *St. Paul Mercury Ins. V. CorVel Corp.*, No. SA CV17-01311 JAK (JPRx), 2018 WL 8131218, at *2 (C.D. Cal. Sept. 28, 2018) ("Defendants have conceded the authenticity of Exhibits C and E because they have submitted copies of these exhibits in support of their opposition to the MSJ.").

authentic[.]" *Id.* (emphasis added). Defendant asserts that Exhibits 4-6, 8-12, 14, and 15 were collected from the computer Ms. Gibson used while employed at SPAWAR and from SPAWAR's files. *See* Doc. No. 32 at 3. Defendant claims that these exhibits were produced to Plaintiffs in accordance with the joint discovery plan. *See id.* Plaintiffs do not address the joint discovery plan or otherwise explain, as the objecting party, why the information collected from Ms. Gibson's computer and SPAWAR's files are not authentic. As such, the Court finds that Exhibits 4-6, 8-12, 14, and 15 are sufficiently authenticated for the present purpose.

Accordingly, because the Court finds that Exhibits 1-15 have been sufficiently authenticated, the Court **OVERRULES** Plaintiffs' objections on this basis.

b. Hearsay

Next, Plaintiffs argue that Defendant "relies upon unauthenticated hearsay as the basis for its motion for summary judgment." Doc. No. 29 at 4. In response, Defendant claims that the exhibits are admissible as non-hearsay admissions by a party-opponent, or alternatively, under various hearsay exceptions. *See* Doc. No. 32 at 4.

Hearsay is a statement made out of court offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Unless evidence satisfies an exception to the hearsay rule, or can be classified as non-hearsay, it is inadmissible at trial. Where evidence presents a hearsay within hearsay problem, "each layer of hearsay must satisfy an exception to the hearsay rule." *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1045 (9th Cir. 1999); *see also* Fed. R. Evid. 805.

Here, Plaintiffs' hearsay objections are not well-taken. The emails, letters and spreadsheets created and sent by Ms. Gibson (Exhibits 2, 3, 4, 6, 8, 11, and 13 -15) are admissible as non-hearsay statements of a party opponent. *See* Fed. R. Evid. 801(d)(2). Ms. Gibson's statements are admissible against Plaintiffs as subrogees standing in Ms. Gibson's place for this lawsuit. *See Chubb Custom Ins. v. Space Sys.*, 710 F.3d 946, 957 (9th Cir. 2013) (noting that in subrogation actions, the "insurer (the subrogee) 'stands in the shoes' of the insured (the subrogor), and succeeds to the insured's rights and

remedies."); *Diamond State Ins. Co. v. Deardorff*, No. 10-cv-00004 AWI JLT, 2011 WL 2414391, at *5 (E.D. Cal. June 8, 2011) (explaining that the subrogees are bound by certain admissions of their insureds).

Additionally, the medical records (Exhibits 1, 7, and 12) and reports prepared for SPAWAR (Exhibits 5 and 9) could be presented in an admissible form at trial pursuant to the hearsay exceptions for business records and statements made for medical diagnosis or treatment. *See* Fed. R. Evid. 803(6), 803(4). Thus, the Court may consider these exhibits in the summary judgment context. *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). As such, the Court **OVERRULES** Plaintiffs' objections to Exhibits 1-9, and 11-15. Because the Court does not rely on Exhibit 10 in ruling on Defendant's motion, Plaintiffs' objection to this exhibit is moot.

2. **Defendant's Motion for Summary Judgment**

Defendant argues that Plaintiffs' claim accrued by October 2015, or February 2016 at the latest, which is when Ms. Gibson was aware of her injury and believed that her injury had been caused by environmental exposure at SPAWAR. *See* Doc. No. 25-2 at 3. Because Plaintiffs did not submit their administrative tort claims until March 9, 2018, Defendant asserts that Plaintiffs' claim is barred by the applicable statute of limitations. *See id.* at 2. In opposition, Plaintiffs contend that the claim accrued at the earliest in September 2016, when Ms. Gibson underwent a bronchoscopy that revealed that Ms. Gibson had been infected with three types of aspergillus mold and also tested positive for exposure to Nocardia. *See* Doc. No. 29 at 8; *see also* Doc. No. 29-2, Ex. A. Thus, Plaintiffs' claim is timely.

Under the FTCA, "a tort claim against the United States is barred unless it is presented in writing to the appropriate federal agency 'within two years after such claim accrues.'" *United States v. Kubrick*, 444 U.S. 111, 113 (1979) (quoting 28 U.S.C. § 2401(b)). The FTCA's statute of limitations "is the balance struck by Congress in the context of tort claims against the Government; and we are not free to construe it so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims." *Id.*

at 117. "When it takes some time for the injury to become apparent, as here, federal courts apply the so-called discovery rule to determine accrual." *Frasure v. United States*, 256 F. Supp. 2d 1180, 1185 (D. Nev. 2003). In cases "involving medical malpractice or hidden injures, the claim does not accrue until the plaintiff knows or in the exercise of reasonable diligence should know of both the injury and its cause." *Dyniewicz v. United States*, 742 F.2d 484, 486 (9th Cir. 1984). The standard is an objective one, with the cause of action accruing when a "reasonable person" would have discovered both the injury and the cause. *In re Swine Flu Prods. Liability Litig.,* 764 F.2d 637, 639 (9th Cir. 1985).

Defendant relies primarily on the Supreme Court's decision in *Kubrick*. There, the Supreme Court held that the plaintiff's cause of action accrued in January 1969 when a doctor informed the plaintiff that it was highly possible that his hearing loss was the result of the antibiotic treatment administered at the hospital following leg surgery. 444 U.S. at 113-14. The Supreme Court explained that a claim accrues so long as a plaintiff is "in possession of the critical facts that he has been hurt and who has inflicted the injury." *Id.* at 122.

Plaintiffs, however, claim that Ms. Gibson's own self-diagnosis and speculation is insufficient to begin the statute of limitations. Although not cited by either party, several recent cases support Plaintiff's position. For example, in *Bayless v. United States*, the Tenth Circuit held that an FTCA claim for a plaintiff injured by exposure to sarin nerve gas did not accrue during the years in which the plaintiff sought a diagnosis from doctors, even though, at some point, she had sufficient information to suspect her injury's true cause. 767 F.3d 958, 968-70 (10th Cir. 2014). In February 2007, several years after the plaintiff began experiencing symptoms, the plaintiff met with a specialist in neurotoxicity, Dr. Rea. *See id.* at 964. Dr. Rea recorded in his notes that the plaintiff "strongly suspects that she was exposed to sarin nerve gas at the Dugway Proving Ground." *Id.* Dr. Rea administered a cholinesterase test, and the plaintiff received a positive result showing low cholinesterase levels. *See id.* Dr. Rea indicated that the

plaintiff suffered from an organophosphate pesticide toxicity. *See id.* The Tenth Circuit held that the plaintiff's FTCA claim did not accrue until her consultation with Dr. Rea, when the plaintiff knew that her suspicions were valid. *Id.* at 969. The court noted, "what Ms. Bayless had before [she saw Dr. Rea] was a lay person's suspicion. While in some circumstances that might be sufficient to trigger the statute, it cannot do so here when the context is considered." *Id.* at 968; *see also Stoleson v. United States*, 629 F.2d 1265, 1270 (7th Cir. 1980) ("A layman's subjective belief, regardless of its sincerity or ultimate vindication, is patently inadequate to go to the trier of fact.").

Additionally, in *Frasure*, the plaintiff, a young boy, often played outside with his friends on abandoned industrial land near his home in Sparks, Nevada. 256 F. Supp. 2d at 1182. On occasion, the plaintiff and his friends would dig in the dirt and uncover yellowish crystals. *See id.* In February 1994, the plaintiff's previously transplanted kidney failed, and the plaintiff began suffering from the failure of his bone marrow, aplastic anemia, pancytopenia, gastro-intestinal bleeding, severe mucocutaneous lesions in the mouth, inability to swallow, fevers, rashes, and the loss of his hair. *See id.* at 1183. The plaintiff later learned that the land on which he played is the former Monite Explosives Factory Site, owned by the United States, which became the focus of a superfund cleanup between 1995 and 1997 due to high levels of trinitroluene ("TNT"), dinitrotoluene ("DNT"), and other hazardous substances. *See id.* at 1182. Plaintiff filed suit under the FTCA in 1998. At summary judgment, the government argued that the plaintiff's claim was untimely because in 1995, the plaintiff's parents: (1) obtained a fact sheet from the government drawing a direct correlation between blood injuries and the dangerous substances at the Monite site; and (2) contacted an attorney. *See id.* at 1185. The district court rejected the government's argument, holding that the plaintiff's claim "did not begin to accrue until Dr. Levin informed [the plaintiff] of the probability of the link between the toxins at the Monite Site and the Plaintiff's illness." *Id.* at 1186-87. The court reasoned that "[n]one of the doctors with whom [the plaintiff] had previously consulted drew a sufficient link between the Plaintiff's illness and the TNT and DNT at

the Monite Site." *Id.* at 1187.

Here, the question before the Court is when Ms. Gibson knew or should have known the probable cause of her injuries. Defendant contends that Plaintiffs' claim accrued in October 2015 when Ms. Gibson identified environmental conditions at SPAWAR as the cause of her infection. *See* Doc. No. 25-2 at 3. In support of its position, Defendant cites to a questionnaire completed by Ms. Gibson wherein she claims that her upper respiratory infections were caused by exposure to mold at work. *See* Lodgment, Ex. 4. Defendant further relies on a medical record that Plaintiffs produced which documents Ms. Gibson's report of environmental exposures at work and her upper respiratory infections. *See id.*, Ex. 1. However, Ms. Gibson completed the questionnaire in April 2016 and the medical record is dated October 20, 2016—long after Ms. Gibson's symptoms began. Contrary to Defendant's assertion, this evidence does not reveal what Ms. Gibson knew or suspected to be the cause of her symptoms in October 2015. Rather, after the benefit of learning from physicians that she had been exposed to mold in the workplace, Ms. Gibson *later* reported the connection between her symptoms and her environmental exposure at work and identified that her symptoms began as early as October 2015.[3] As such, Defendant's argument that Plaintiffs' claim accrued in October 2015 is unpersuasive.

Defendant next argues that "[a]t the very least, Ms. Gibson was aware of her injury and believed that the injury had been caused by environmental exposure at SPAWAR by February 2016." Doc. No. 25-2 at 3. For example, in February 2016, Ms. Gibson documented the symptoms she experienced at work in a spreadsheet. *See* Lodgment, Ex. 6. Ms. Gibson claims she experienced watery eyes, blurry vision, sinus pressure, headaches, sore throat, heavy chest, fatigue, and congestion. *See id.* Additionally, in an

---

[3] Defendant highlights the fact that Ms. Gibson asserted that her injury manifested in October 2015 as part of her workers' compensation claim. This is unremarkable, however, as Ms. Gibson has every incentive to trace her symptoms back to the earliest possible date in pursuing her workers' compensation claim.

email to her colleague dated February 16, 2016, Ms. Gibson reported that she is "feeling ok" but continued to experience a "[h]eavy chest," "snotty nose and cough[.]" *Id.*, Ex. 8. Ms. Gibson further added that she "need[s] to call and schedule [her] tests. . . . . Seems when I had my blood work done I *should have* had them test for fiberglass, mold, and aldehyde again[.]" *Id.* (emphasis added). However, similar to *Bayless* and *Frasure*, Ms. Gibson's suspicion as to the cause of her symptoms is insufficient in this case to start the statute of limitations in February 2016. Notably, in November 2015, an industrial hygienist inspected the office in which Ms. Gibson worked and reported that "no evidence of water intrusion or mold growth was found." *Id.*, Ex. 5. As Ms. Gibson's email records reflect, she diligently pursued treatment and sought to determine the cause of her symptoms and "should have" had the doctors test for fiberglass, mold, and aldehyde again. *See id.*, Ex. 8. Thus, in February 2016, Ms. Gibson was not "in possession of the critical facts that [s]he has been hurt and who has inflicted the injury." *Kubrick*, 444 U.S. at 122.

It was not until April 19, 2016, that Ms. Gibson's pulmonary specialist, Dr. Lichter, "sent off some testing of antibodies for what is called hypersensitivity pneumonitis to see if [she] had been exposed to things[.]" Lodgment, Ex. 12. "One of the tests that came back positive, which means you have had an exposure[,] is the test to mold, Astragalus Hypoglottis and I know that you think you have been exposed to mold at your work, so that is kind of, of interest . . . and we'll need to talk some more about that[.]" *Id.* Dr. Lichter further informed Ms. Gibson that she tested negative for Valley Fever, her "sedimentation rate is totally normal," "[r]heumatoid factor was negative," and her "TB QuantiFERON-and Gold blood test was negative." *Id.*

Defendant contends that the accrual date should not equate to the date of a medical diagnosis. However, "[o]rdinarily, a plaintiff cannot be expected to discover the general medical cause of his injury even before the doctors themselves are able to do so." *Rosales v. United States,* 824 F.2d 799, 805 (9th Cir.1987). The evidence presented in this case demonstrates that prior to April 19, 2016, Ms. Gibson may have suspected that

her symptoms were caused by environmental exposure at work, but indoor air quality testing revealed no evidence of mold growth in November 2015, and no high or unusual concentrations of mold spores near Ms. Gibson's work station in March 2016. Thus, Ms. Gibson did not know, or in the exercise of reasonable diligence, should she have known, the probable cause of her injury until, at the earliest, April 2016, when she learned for the first time that she tested positive for mold exposure and Dr. Lichter noted the possible connection to Ms. Gibson's place of employment.[4] *See Frasure*, 256 F. Supp. 2d at 1186-87 ("Nevertheless, under the particular facts of this case, Plaintiff's claim did not begin to accrue until Dr. Levin informed him of the probability of the link between the toxins at the Monite Site and the Plaintiff's illness."); *Lamont v. United States*, No. 15-cv-173 JLH/BD, 2017 WL 525671, at *1 (E.D. Ark. Jan. 17, 2017) (holding that the plaintiff discovered the probable cause of his alleged injuries when medical staff informed him that "both his breathing and skin issues could have been caused by mold and fungus in the buildings of FCI-Low."), *report and recommendation adopted*, 2017 WL 525112 (E.D. Ark. Feb. 8, 2017), *aff'd sub nom Lamont v. Untied States*, 712 F. App'x 591 (8th Cir. 2018).

Under California law, Plaintiffs, as subrogees, are subject to the same statute of limitations and accrual date as if Ms. Gibson brought the present FTCA claim herself. *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1217 (9th Cir. 2003) ("Because of the derivative nature of subrogation, a subrogee insurer is subject to 'the same statute of limitations that would have been applicable had the insured brought suit in his or her own behalf.'") (quoting *Great Am. W., Inc. v. Safeco Ins.*, 227 Cal. Rptr. 349, 353 (Ct. App. 1991)). Here, Plaintiffs submitted administrative tort claims to the U.S. Navy on March 9, 2018—within two years of the earliest possible accrual date,

---

[4] For purposes of the instant motion, the Court finds only that Plaintiffs' FTCA claim accrued, at the earliest, in April 2016. The Court, however, makes no express finding as to the exact date of accrual.

April 19, 2016.  Accordingly, Plaintiffs' claim is timely and Defendant is not entitled to summary judgment as a matter of law.

## **CONCLUSION**

Based on the foregoing, the Court **DENIES** Defendant's motion for summary judgment.  <u>The parties must contact the assigned magistrate judge's chambers within **three (3) business days** of the date of this Order to reset the previously vacated dates in the Scheduling Order</u>.

**IT IS SO ORDERED.**

Dated:  March 11, 2020

*/s/ Michael M. Anello*
HON. MICHAEL M. ANELLO
United States District Judge